IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE:<br><br>**WILLIAM A. CLEVELAND and KATIA L. CLEVELAND,**<br><br>        **Debtors.** | **Filed / Docketed**<br>**September 30, 2008**<br><br>**Case No. 07-10569-M**<br>**Chapter 13** |
| IN RE:<br><br>**JAN L. ELLIS-GOUGH,**<br><br>        **Debtor.** | **Case No. 07-10609-M**<br>**Chapter 13** |
| IN RE:<br><br>**BRIAN R. INKS,**<br><br>        **Debtor.** | **Case No. 07-11326-M**<br>**Chapter 13** |

## MEMORANDUM OPINION

Six claims.  Four debtors.  Three cases.  Two claimants.  One whale of a dispute.  Debtors in each of these Chapter 13 cases (collectively "Debtors") have filed objections to proofs of claim filed by alleged assignees of their pre-petition debts.[1]  Debtors assert that the claims would be unenforceable under applicable law and should be disallowed.  Claimants vehemently disagree and bring substantial evidence in support of their cause.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to these contested matters pursuant to Federal Rule of Bankruptcy Procedure 9014.

---

[1]  While the facts surrounding the creation of the debts at issue tend to differ, the relevant facts and legal issues presented in each case are identical.  Each of the Debtors share the same counsel.  In addition, both of the claimants are represented by the same counsel.  As a result, the Court has determined that the most efficient manner to resolve these issues is with a single memorandum opinion.

**Jurisdiction**

The Court has jurisdiction over these matters pursuant to 28 U.S.C.A. § 1334(b).[2]  Reference

to the Court of these bankruptcy cases is proper pursuant to 28 U.S.C.A. § 157(a).  These are core

proceedings as contemplated by 28 U.S.C.A. § 157(b)(2)(B).

**Findings of Fact**

These cases involve objections to proofs of claim filed by B-Real, LLC ("B-Real") or

Roundup Funding, LLC ("Roundup").  B-Real and Roundup, together with a related entity called

B-Line, LLC ("B-Line") (collectively "Claimants"),  are engaged in the business of purchasing and

servicing unsecured bankruptcy receivables.  Mr. Steven G. Kane, a representative of Claimants,

testified regarding their business model.[3]  He indicated that Claimants have entered into various

purchase agreements with holders of consumer debt, who are often credit card issuers, to purchase

accounts after the obligors on those accounts have filed for bankruptcy.  The specific accounts are

then transferred on a monthly basis through a bill of sale, which includes a computer file that

contains the account information for the individual debtors and the accounts transferred in that

installment.  The Claimants' efforts at collection of these debts consist solely of filing proofs of

claim in the underlying bankruptcy case associated with each account.

---

[2]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*. (West 2008).  Unless otherwise noted, all references to "Rules" are to the Federal Rules of Bankruptcy Procedure, as amended, effective December 1, 2007 (West 2008).  All other references to federal statutes and rules are also to West 2008 publications.

[3]  According to Mr. Kane, B-Real is a partially-owned subsidiary of B-Line; Roundup is a fully-owned subsidiary of B-Line.  B-Real and Roundup are companies that purchase bankruptcy receivables.  The servicing of those receivables, such as filing proofs of claim in the various bankruptcy cases, is provided by B-Line.

Debtors all lodge identical objections to the subject claims:  1)  the proofs of claim at issue do not comply with Rule 3001(c), and are therefore not entitled to a presumption of prima facie validity under Rule 3001(f); 2) Debtors are not indebted to Claimants, because Claimants have not established that they are legal owners of any debt owed by Debtors; 3) Debtors dispute the amount asserted by Claimants in their proofs of claim;[4] and 4) even if Claimants are found to be legal owners of the debt, such claims are not enforceable under Oklahoma law.  Let us begin with a review of the individual Debtors and the facts surrounding their specific claims.

**William A. and Katia L. Cleveland**

On March 28, 2007, William A. Cleveland and Katia L. Cleveland (the "Clevelands") filed a petition for relief under Chapter 13 of the United States Bankruptcy Code.[5]  Listed on their schedule of creditors holding unsecured nonpriority claims (Schedule F) are two relevant claims: 1) a debt for "Credit Card Purchases" incurred in 2003 to "Chase," Account No. X2447, in the amount of $1,218.00 by Katia Cleveland; and 2) a debt for "Credit Card Purchases" incurred in 2001 to "Chase," Account No. X3826, in the amount of $3,640.00 by William Cleveland.  Both claims are marked as "Disputed" on Schedule F without further explanation.[6]

*Cleveland Claim # 17-2*

On July 13, 2007, B-Real filed a proof of claim ("Cleveland Claim # 17-1"), naming Katia L. Cleveland as the debtor.  Cleveland Claim # 17-1 is an unsecured non-priority claim for

---

[4]  As discussed *infra*, for two of the six claims, Cleveland Claim # 18-3 and Inks Claim # 13-2, Debtors have stipulated that they do not dispute the claimed amount if the Court finds the claims to be otherwise enforceable.

[5]  *Case No. 07-10569-M, Docket No. 1.*

[6]  The Court notes that 12 of the 16 debts listed in the Cleveland's Schedule F are designated as "Disputed," although no explanation of the nature of these disputes is provided.

3

$1,326.30 based on a "Credit Card," Account No. X2447, and does not indicate that the claim includes any interest or other charges in addition to the principal amount of the claim. Attached to Cleveland Claim # 17-1 is a single page titled "Account Summary." The summary includes: identifying information about the Clevelands and their bankruptcy filing; "Balance at Time of Filing:" $1,326.30; "Creditor Name:" B-Real, LLC; "Account Number:" X2447; "Assignor:" Chase Bank USA, N.A.; "Charge Off Date:" 06/01/2007; "Open Date:" 11/18/2003. On November 1, 2007, B-Real filed an amendment ("Cleveland Claim # 17-2") that includes copies of credit card statements from Chase for Account No. X2447 for 7 months, reflecting charges from August 2006 to March 2007. The final statement shows a "New Balance" of $1,326.30.

At the hearing on these matters, B-Real submitted statements for an additional 13 months, covering charges from July 2005 to July 2006.[7] In addition, B-Real presented a "Purchase Agreement Between Chase Bank USA, N.A. and B-Line, LLC Dated as of April 1, 2007," which sets forth the terms of sale of certain credit card accounts from Chase Bank USA, N.A. ("Chase") to B-Line. Also provided was a bill of sale from Chase to B-Line, dated June 21, 2007, for specific accounts pursuant to the purchase agreement. The bill of sale incorporates a computer file generated by Chase that identifies each of the particular accounts sold to B-Line. B-Real presented a redacted form of that computer file that includes certain identifying information regarding Katia Cleveland and Account No. X2447. Finally, B-Real provided an "Assignment of Accounts and Waiver of Notice of Transfer of Claims," dated June 22, 2007, which appears to assign the referenced account from B-Line to B-Real.

Mr. Cleveland testified that he had reviewed the card holder agreement for Chase Account

---

[7] *Cleveland Joint Exhibit 3.*

4

No. X2447, although he did not produce a copy of the agreement.  He testified that he marked the claim as disputed because he did not believe Chase could lawfully increase his interest rate beyond 9.9% or charge various over-the-limit and late payment fees. He stated that he raised this dispute regarding the fees and interest rate in phone calls to Chase prior to filing his petition, but that they were unwilling to work with him.  It does not appear that his "dispute" with Chase was purely contractual, in that it corresponded with his personal financial difficulties and his inability to make timely payments.[8]

*Cleveland Claim # 18-3*

On July 30, 2007, Roundup filed a proof of claim ("Cleveland Claim # 18-1"), naming William Cleveland as the debtor.  Cleveland Claim # 18-1 is an unsecured non-priority claim for $4,073.93 based on "Money loaned," Account No. X9073, and does not indicate that the claim includes any interest or other charges in addition to the principal amount of the claim.  Attached to Cleveland Claim # 18-1 is a single page titled "Account Summary."  The summary includes: identifying information about the Clevelands and their bankruptcy filing; "Balance at Time of Filing:"  $4,073.93; "Creditor Name:" Roundup Funding, LLC; "Account Number:" X9073; "Assignor:" Crown Asset Management, LLC; "Original Creditor:" Chase Manhattan Bank, NA; "Related Account Number:" X3826; "Charge Off Date:" none; "Open Date:" none.  On November

---

[8] *Transcript of Proceedings Held on June 4, 2008, Case 07-10569-M, Docket No. 183–84,* (hereafter *"Transcript"*), Page 45 lines 6–10:

> Mr. Colpitts (attorney for Debtors):  And prior to filing bankruptcy did you ever dispute the debt with Chase Bank?
>
> William Cleveland:  Yes. I mean over the -- when we were -- when we realized things were going pretty rough and that we were going to need --

1, 2007, Roundup filed an amendment ("Cleveland Claim # 18-2") that includes a single account statement identifying Chase, Mr. Cleveland, Account No. X3826, a statement closing date of January 8, 2004, indicating a "New Balance" of $0.0, and that a total of $3,640.65 in principal and finance charges was "charged off" on the closing date.[9]  On March 17, 2008, a second amendment was filed ("Cleveland Claim # 18-3"), which indicates that the claim is secured and based on a judgment, with collateral valued at $5,583.97.[10]  Attached to the amended proof of claim is a second "Account Summary," as well as a "Journal Entry of Judgment" (the "Judgment"), for $4,073.93 plus interest, costs, attorney fees, and accruing interest, entered in Tulsa County (Oklahoma)  District Court, dated July 13, 2005, in favor of Crown Asset Management, LLC ("Crown"), naming William A. Cleveland as the defendant.

At the hearing on these matters, Roundup presented a "Bankruptcy Receivable Forward Flow Purchase Agreement," dated August 31, 2004, which sets forth the terms of sale of certain credit card accounts from Crown to B-Line.  Also provided is an "Assignment of Accounts and Waiver of Notice of Transfer of Claims" from Crown to Roundup, dated June 28, 2007, for specific accounts pursuant to the purchase agreement.  The assignment incorporates a computer file generated by Crown that identifies each of the particular accounts assigned to Roundup.  Roundup presented a

---

[9]  Cleveland Claim # 18-2 also contains an attachment that was described by Mr. Kane as "a screen print from Chase's system of record," although the Court could not discern that it contained any relevant information.  The Court notes that *Cleveland Joint Exhibit 9*, which purports to be a copy of Cleveland Claim # 18-2, contains an additional statement identifying Mr. Cleveland, Account No. X3826, indicating a "New Balance" of $3,640.65, a bill date of January 7, 2004, but containing no creditor identification.  Its inclusion in *Cleveland Joint Exhibit 9* appears to be a mistake.

[10]  At the hearing on these matters, Mr. Kane did not give a logical explanation for why this debt was marked as secured.  There has been no indication that any type of lien was filed on property of the Clevelands.

redacted form of that computer file that includes certain identifying information regarding William Cleveland and Account No. X3826.

Mr. Cleveland testified that he had never heard of B-Real, Roundup, or Crown prior to filing his bankruptcy petition.[11]  He also denied ever having been served with a lawsuit by Crown.[12] Instead, Mr. Cleveland suggested that the Judgment may refer to another William A. Cleveland living in Tulsa.[13]  The Court finds this testimony incredible, given that Mr. Cleveland admitted the existence of the Judgment in his Statement of Financial Affairs.[14]  The Court finds as a matter of fact that Crown holds an enforceable judgment against Mr. Cleveland.  Absent evidence that Crown has a valid lien on property of the Clevelands, the Court will treat the claim as unsecured.  Mr. Cleveland has stated that if the Court finds that he owes a debt to Crown, then he does not further dispute the amount owed.

---

[11]   *See Transcript*, Page 40 line 20 to Page 41 line 6, specifically Page 41 line 1–6:

Mr. Colpitts:  Had you ever heard of Crown Asset Management, LLC?

William Cleveland:  No.  Well, since we've talked about it, but I had never heard of them before that.

Mr. Colpitts:  So prior to this bankruptcy you had never heard of them?

William Cleveland:  No.

[12]   *Id.* at Page 41 line 20–22:

Mr. Colpitts:  Were you ever served with a lawsuit by Crown Asset Management?

William Cleveland:  No.

[13]   *Id.* at Pages 42–44.

[14]   *Case 07-10569-M, Docket No. 1*, at 31 and *Cleveland Joint Exhibit 14* at 14-31.

**Jan L. Ellis-Gough**

On March 30, 2007, Jan L. Ellis-Gough filed a petition for relief under Chapter 13 of the United States Bankruptcy Code.[15] Listed on her schedule of creditors holding unsecured nonpriority claims (Schedule F) are two relevant claims: 1) a debt for "Credit Card Purchases" incurred between 1996 and 2006 to "Chase Bank USA, N.A.," Account No. X1356, in the amount of $17,619.00; and 2) a debt for "Credit Card Purchases" incurred between 1998 and 2006 to "Chase," Account No. X0507, in the amount of $3,770.00. Both claims are marked as "Disputed" on Schedule F.[16]

*Ellis-Gough Claims # 5-2 & # 6-2*

On July 13, 2007, B-Real filed a proof of claim ("Ellis-Gough Claim # 5-1") in the Ellis-Gough case. Ellis-Gough Claim # 5-1 is an unsecured non-priority claim for $17,619.60 based on a "Credit Card," Account No. X1356, and does not indicate that the claim includes any interest or other charges in addition to the principal amount of the claim. Attached to Ellis-Gough Claim # 5-1 is a single page titled "Account Summary." The summary includes: identifying information about Ms. Ellis-Gough and her bankruptcy filing; "Balance at Time of Filing:" $17,619.60; "Creditor Name:" B-Real, LLC; "Account Number:" X1356; "Assignor:" Chase Bank USA, N.A.; "Charge Off Date:" 05/31/2006; "Open Date:" 02/04/1998. On November 1, 2007, B-Real filed an amendment ("Ellis-Gough Claim # 5-2") that includes a copy of a single credit card billing statement

---

[15] *Case No. 07-10609-M, Docket No. 1.*

[16] The Court notes that all 5 debts listed in Ms. Ellis-Gough's Schedule F are designated as "Disputed," although no explanation of the nature of these disputes is provided.

from Chase for Account No. X1356, with a statement closing date of May 13, 2006.[17] The statement indicates a "New Balance" of $17,619.60.  At the hearing on these matters, B-Real submitted account statements for an additional 22 months, covering charges from approximately May 2004 to March 2006.[18]

On July 13, 2007, B-Real filed a second proof of claim ("Ellis-Gough Claim # 6-1") in the Ellis-Gough case.  Ellis-Gough Claim # 6-1 is an unsecured non-priority claim for $3,770.28 based on a "Credit Card," Account No. X0507, and does not indicate that the claim includes any interest or other charges in addition to the principal amount of the claim.  Attached to Ellis-Gough Claim # 6-1 is a single page titled "Account Summary."  The summary includes:  identifying information about Ms. Ellis-Gough and her bankruptcy filing; "Balance at Time of Filing:"  $3,770.28; "Creditor Name:"  B-Real, LLC; "Account Number:" X0507; "Assignor:" Chase Bank USA, N.A.; "Charge Off Date:" 06/30/2006; "Open Date:" 06/30/1998.   On November 1, 2007, B-Real filed an amendment ("Ellis-Gough Claim # 6-2") that includes a copy of a single credit card billing statement from Chase for Account No. X0507, with a statement closing date of June 8, 2006.[19]  The statement indicates a "New Balance" of $3,770.28.  At the hearing on these matters, B-Real submitted statements for an additional 24 months, covering charges from April 2004 to April 2006.[20]

In addition, at the hearing, B-Real presented a "Purchase Agreement Between Chase Bank

---

[17]  Also attached is an unidentified document that appears to be a print out of a computer screen.

[18]  *Ellis-Gough Joint Exhibit 3.*

[19]  Also attached is an unidentified document that appears to be a print out of a computer screen.

[20]  *Ellis-Gough Joint Exhibit 6.*

USA, N.A. and B-Line, LLC Dated as of April 1, 2007," which sets forth the terms of sale of certain credit card accounts from Chase to B-Line. Also provided is a bill of sale from Chase to B-Line, with an effective date of May 16, 2007, for specific accounts pursuant to the purchase agreement. The bill of sale incorporates a computer file generated by Chase that identifies each of the particular accounts sold to B-Line. B-Real presented a redacted form of that computer file that includes certain identifying information regarding Ms. Ellis-Gough and Account Nos. X1356 and X0507. Finally, B-Real provided an "Assignment of Accounts and Waiver of Notice of Transfer of Claims," dated May 23, 2007, which appears to assign the referenced accounts from B-Line to B-Real.

Ms. Ellis-Gough testified that she had never heard of B-Real prior to filing her petition. She stated that she does not believe she owes any debt to B-Real; she believes she owes a debt to Chase, but is unable to determine the amount. She testified that the account statements related to Ellis-Gough Claim # 5-2 were being sent to her former husband for some period, but that after he did not make timely payments, she had the account statements sent directly to her. For the period the statements were being sent to her former husband, Ms. Ellis-Gough states that she does not know what charges or payments were made on the account. Although she always received statements for Account No. X0507, and has received statements regarding Account No. X1356 directly from Chase since early in 2005, she does not know how much is owed on either account. Ms. Ellis-Gough did not contact Chase about her debts prior to filing her bankruptcy petition. Other than indicating uncertainty on the amount owed, her testimony did not identify the basis for her dispute of these debts.[21]

---

[21]   The Court notes that the debts were marked disputed in Schedule F of her petition, which was filed prior to the initiation of these claims proceedings and prior to the acquisition of the claims by B-Real.

**Brian R. Inks**

On July 13, 2007, Brian R. Inks filed a petition for relief under Chapter 13 of the United States Bankruptcy Code.[22]  Listed on his schedule of creditors holding unsecured nonpriority claims (Schedule F) are two relevant claims:  1) a debt for "Credit Card Purchases" incurred between 1990 and 2006 to "Sears/CBSD," Account No. X2855, in the amount of $1,724.00; and 2) a debt for "Credit Card Purchases" incurred from 1998 to 2006 to "Chase/Bank One," Account No. X1203, in the amount of $2,811.00.  Both claims are marked as "Disputed" on Schedule F.[23]

*Inks Claim # 9-2*

On August 31, 2007, Roundup filed a proof of claim ("Inks Claim # 9-1") in the Inks case. Inks Claim # 9-1 is an unsecured non-priority claim for $4,590.51 based on "Money loaned," Account No. X2855, and does not indicate that the claim includes any interest or other charges in addition to the principal amount of the claim.  Attached to Inks Claim # 9-1 is a single page titled "Account Summary."  The summary includes:  identifying information about Mr. Inks and his bankruptcy filing; "Balance at Time of Filing:"  $4,590.51; "Creditor Name:" Roundup Funding, LLC; "Account Number:" X2855; "Assignor:" Sherman Acquisition, LLC; "Original Creditor:" Sears - Sears Premier Card;  "Charge Off Date:" 12/07/2006; "Open Date:" 03/01/1990.   On January 2, 2008, Roundup filed an amendment ("Inks Claim # 9-2") that includes copies of credit card billing statements from Sears Premier Card for Account No. X2855 for 6 months, reflecting charges from June 2006 to December 6, 2006.  The final statement shows a "New Balance" of $4,590.51.  An additional billing statement for the same account is also provided showing a "New

---

[22] *Case No. 07-11326-M, Docket No. 1.*

[23] The Court notes that 9 out of the 12 debts listed in Mr. Inks's Schedule F are designated as "Disputed," although no explanation of the nature of these disputes is provided.

Balance" of $0.0, and that a total of $4,590.51 in principal and finance charges was "charged off" on December 7, 2006.

At the hearing on these matters, Roundup presented a "Chapter 13 Bankruptcy Receivables Purchase Agreement" between Sherman Acquisition, LLC ("Sherman") and Roundup, dated March 28, 2007, which sets forth the terms of sale of certain credit card accounts from Sherman to Roundup. Sears is listed in Exhibit A to the purchase agreement as being an "original seller" of accounts held by Sherman that are assigned under the agreement.[24] Also provided is an "Assignment of Accounts" from Sherman to Roundup, dated August 21, 2007, for specific accounts pursuant to the purchase agreement. The assignment incorporates a computer file generated by Sherman that identifies each of the particular accounts sold to Roundup. Roundup presented a redacted form of that computer file that includes certain identifying information regarding Mr. Inks and Account No. X2855. No document was submitted that memorialized the transfer of the account from Sears to Sherman.

*Inks Claim # 13-2*

On October 29, 2007, B-Real filed a proof of claim ("Inks Claim # 13-1") in the Inks case. Inks Claim # 13-1 is an unsecured non-priority claim for $3,726.57 based on a "Credit Card," Account No. X1203, and does not indicate that the claim includes any interest or other charges in addition to the principal amount of the claim. Attached to Inks Claim # 13-1 is a single page titled "Account Summary." The summary includes: identifying information about Mr. Inks and his bankruptcy filing; "Balance at Time of Filing:" $3,726.57; "Creditor Name:" B-Real, LLC; "Account Number:" X1203; "Assignor:" Chase Bank USA, N.A.; "Charge Off Date:" 09/16/2007;

---

[24]   *See Inks Joint Exhibit 11-15.*

"Open Date:" 09/24/1998.  On April 24, 2008, B-Real filed an amendment ("Inks Claim # 13-2") that includes copies of credit card statements from Chase for Account No. X1203 for 4 months, reflecting charges from March 2007 to July 2007.  The final statement shows a "New Balance" of $3,726.57.[25]

At the hearing on these matters, B-Real submitted statements for an additional 25 months, covering charges from January 2005 to February 2007.[26]   In addition, B-Real presented a "Purchase Agreement Between Chase Bank USA, N.A. and B-Line, LLC Dated as of April 1, 2007," which sets forth the terms of sale of certain credit card accounts from Chase to B-Line.  Also provided is a bill of sale from Chase to B-Line, dated November 19, 2007, for specific accounts pursuant to the purchase agreement.  The bill of sale incorporates a computer file generated by Chase that identifies each of the particular accounts sold to B-Line.  B-Real presented a redacted form of that computer file that includes certain identifying information regarding Mr. Inks and Account No. X1203.  Finally, B-Real provided an "Assignment of Accounts and Waiver of Notice of Transfer of Claims," dated November 21, 2007, which appears to assign the referenced account from B-Line to B-Real.

Mr. Inks claimed not to owe any debt to B-Real, Roundup, or Sherman.  For some period prior to filing his petition, Mr. Inks had transferred power of attorney over his accounts to an entity called Credit Solutions.  That company was engaged by Mr. Inks to negotiate with his creditors in order to lower his interest rate and to work out payment plans.  During this time, Mr. Inks did not have access to his account statements, since all such statements were sent directly to Credit

---

[25]   Although no written objection to this claim was filed before the hearing, the attorney for Mr. Inks stated that the same objections applied to Inks Claim # 13-2 as to Inks Claim # 13-1, and the objection was heard on its merits.

[26]   *Inks Joint Exhibit 3.*

Solutions.  Although Mr. Inks made payments to Credit Solutions, he has no knowledge of whether that entity made any payments to Chase or Sears on his behalf.  Mr. Inks stated that this was why he marked each of his unsecured credit card debts as disputed on Schedule F.  Mr. Inks admits that he owes a debt to Chase in the claimed amount of $3,726.57, but does not believe that B-Real owns the debt.  He disputes the amount claimed by Roundup in Inks Claim # 9-2, in addition to contesting the ownership of the debt by Roundup.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

## Conclusions of Law

All of the contested matters presently before the Court deal with the allowance of claims.[27] Section 101(5) of the United States Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is . . . disputed, [or] undisputed[.]"[28] A "creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]"[29]  Section 501 provides that "[a] creditor . . . may file a proof of claim."[30]  Section 502 states that a claim filed under § 501 is deemed allowed unless a party in interest objects.[31]  Section 502 also provides that upon such objection, after notice and a hearing, the court shall determine the amount of the claim and allow the claim in that amount, except in nine specifically enumerated

---

[27] This paragraph draws heavily from the Court's decision in *In re Chalakee*, 385 B.R. 771, 774 (Bankr. N.D. Okla. 2008).

[28] § 101(5)(A).

[29] § 101(10)(A).

[30] § 501(a).

[31] § 502(a).

situations.[32]  Section 502(b)(1) states that the court shall allow a claim, "except to the extent that—such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]"[33]

Claimants filed proofs of claim in each of these cases on the proper official form that assert a right to payment from the relevant bankruptcy estate.  Debtors have lodged objections to these claims.  The first objection asserted by the Debtors is that the proofs of claim do not comply with Rule 3001(c) and are therefore not entitled to a presumption of prima facie validity under Rule 3001(f).  The Bankruptcy Appellate Panel for the Tenth Circuit has concluded that failure to attach documentation to a claim under Rule 3001(c) is not a proper basis to disallow a claim; those grounds are exclusively found in § 502(b).[34]  Debtors also allege that they have no liability on the claims as filed because Claimants have not proven they are the owners of the claims with a right to payment; that even if Claimants own the subject claims, Debtors dispute the amounts asserted in the proofs of claim; and that such claims are not enforceable under Oklahoma law.  These objections are sufficient to prevent the claims from being deemed allowed under § 502(a), and to trigger Court determination of the claims under § 502(b)(1).[35]

---

[32] § 502(b).  *See also B-Line, LLC v. Kirkland (In re Kirkland)*, 379 B.R. 341 (10th Cir. BAP 2007).

[33] § 502(b)(1).

[34] *In re Kirkland*, 379 B.R. at 344.  While I disagreed with the majority's application of this rule to the trustee in that case, I have no doubt that it should be applied where an objection is raised by a debtor.  *See also In re Samson*, 392 B.R. 724, at *8 (Bankr. N.D. Ohio 2008) (noting that a different evidentiary standard may be applied to a proof of claim depending on the identity of the objecting party).

[35] *See In re Broadband Wireless Int'l Corp.*, 295 B.R. 140, 145 (10th Cir. BAP 2003).

In making its determination under § 502(b), the Court is "required to treat the [proof of claim] as prima facie evidence of the validity and amount of the claim, *provided* that it was 'executed and filed in accordance with' the Bankruptcy Rules[.]"[36]    The parties hotly dispute whether the proofs of claim, as filed in each case, were "executed and filed in accordance with" Bankruptcy Rule 3001(c), and by extension, whether they are sufficient to create a prima facie presumption as to the validity and amount of the claims.[37]    The Court need not address this issue. At the hearing on these matters, Claimants chose not to stand on their proofs of claim as filed, but to submit additional evidence to the Court, thus rendering any resort to the presumption unnecessary. If the Court finds that Claimants' evidence is sufficient to meet their initial burden of production on the issues of validity and amount, whether as the result of a presumption or by submission of additional evidence, the burden will then shift to Debtors to "bring forward evidence equal in probative force to that underlying the proof of claim."[38]    Only then will Claimants bear the ultimate burden of persuasion.

In the face of a substantive objection by a party in interest, the Court is required to determine the amount of each claim as of the petition date, and to allow the claim in that amount, except to the extent the claim is unenforceable against the debtor or the debtor's property under applicable law.[39]

---

[36]    *Id.  See also In re Harrison*, 987 F.2d 677 (10th Cir. 1993) ("A *properly filed* proof of claim is prima facie evidence of the validity and amount of the claim.").

[37]    *In re Broadband Wireless Int'l Corp.*, 295 B.R. at 145. ("Note, however, that if the [proof of claim] were executed or filed improperly, it was *not* prima facie evidence of [creditor]'s claim, and [*creditor*] would have the initial burden of proving that a claim exists and the amount of that claim.").

[38]    *In re Fullmer*, 962 F.2d 1463, 1466 (10th Cir. 1992), *abrogated on other grounds by Raleigh v. Ill. Dept. of Rev.*, 530 U.S. 15 (2000).

[39]    § 502(b)(1).

Claimants therefore must first establish that they hold enforceable claims against the respective Debtors.  The same burdens of production and persuasion apply here as would apply outside of bankruptcy.[40]  Each of these claims originated as credit card debts.[41]  Collection of these debts in state court would entail an action for breach of contract.  Under Oklahoma law, to recover on a breach of contract theory, Claimants need to prove by a preponderance of the evidence:  1) formation of a contract; 2) a breach of the contract; and 3) damages directly resulting from the breach.[42]  Absent such a showing, Debtors will not be required to disprove the validity or amount of the debt.

*Cleveland Claim # 17-2*; *Ellis-Gough Claims # 5-2 & # 6-2*; *Inks Claim # 13-2*

Each of these claims involve debts that were originally owed to Chase, and the accounts were acquired by B-Real post-petition.  For each claim, B-Real indicates that it holds an unsecured nonpriority claim based on credit card debt.  Attached to each of the proofs of claim is at least one account statement issued to the Debtors by Chase.  The final account statement associated with each claim includes the Debtor's name, refers to their Chase account number, shows an ending balance in the exact amount stated on the proof of claim, includes a breakdown of charges into principal, interest, and fees, and is in the form of a standard business record typically sent from a card issuer to a card holder.  Each of the referenced debts was scheduled by the Debtors as being owed to

---

[40] *Raleigh v. Ill. Dept. of Rev.*, 530 U.S. 15, 19–20 (2000).

[41] Cleveland Claim # 18-3 was reduced to judgment pre-petition, and will be treated separately.

[42] *Digital Design Group, Inc. v. Info. Builders*, 2001 OK 21, 24 P.3d 834, 843; *Okla. Uniform Jury Instruction* No. 23.1.  *See also In re Broadband Wireless Int'l Corp.*, 295 B.R. at 145; *In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008); *In re Herron*, 381 B.R. 184, 188–89 (Bankr. D. Md. 2008); *In re Kendall*, 380 B.R. 37, 47 (Bankr. N.D. Okla. 2007); *In re Cluff*, 313 B.R. 323, 337 (Bankr. D. Utah 2004), *aff'd by* 2006 WL 2820005 (D. Utah 2006).

Chase, although in some cases in different amounts.  At the hearing, each of the Debtors acknowledged that they held credit cards issued by Chase and that there was an outstanding balance at the time they filed their petitions.  These items taken together allow the Court to conclude that Chase held a valid debt against each of these Debtors on the petition date.[43]  For each claim, the final account statement is sufficient to establish the amount of the claim, subject to rebuttal by Debtors.

The claims at issue here were acquired by B-Real through a blanket assignment of claims pursuant to a contract with Chase.  In *In re Rochester*, the court developed a well-reasoned framework for assessing the sufficiency of evidence provided to establish a right to payment by an assignee of such a claim.[44]  The court separated the types of evidence proffered into three categories: 1)  the proof of claim and the blanket assignment identify an assignor that is listed as a creditor on the debtor's schedules; 2) the proof of claim and the blanket assignment identify an assignor that is not listed as a creditor on the debtor's schedules, but where additional documents submitted with the assignment provide a basis to link the claimant to a scheduled creditor; and 3) a proof of claim and the blanket assignment identify an assignor that is not listed as a creditor on the debtor's schedules, and no other documents are submitted that provide a basis to link the claimant to a scheduled creditor.[45]  The Court finds this to be an appropriate framework, and will use it to analyze

---

[43]  *See In re Peck*, No. 07-12251, 2008 WL 416927 at *2 (Bankr. E.D. Pa. Feb. 13, 2008) ("As between the account contract and the account statements then, it is the latter that better informs the Debtor (or the trustee) of the 'validity and the amount' of the claim.").

[44]  *In re Rochester*, No. 03-32184, No. 03-34099, 2005 WL 3670877 (Bankr. N.D. Tex. May 24, 2005) (Houser, J).  This framework has also been adopted in *In re Samson*, 392 B.R. 724, at *6 (Bankr. N.D. Ohio 2008); *In re Armstrong*, 347 B.R. 581, 584 (Bankr. N.D. Tex. 2006) (Hale, J.); *In re White*, No. 06-50247-RLJ13, 2008 WL 269897 at *5 (Bankr. N.D. Tex. Jan. 29, 2008) (Jones, J.).

[45]  *In re Rochester*, 2005 WL 3670877 at *4–*7.

the sufficiency of evidence presented by B-Real.

This set of claims falls in the first category of assignments set out in *In re Rochester*, since they involve a blanket assignment of credit card accounts from Chase to B-Real, and each of these Debtors listed the underlying debts to Chase in their schedules. At the hearing on these matters, B-Real introduced numerous additional account statements for each referenced claim.[46] B-Real also introduced a purchase agreement that establishes the terms by which Chase sells accounts to B-Line. For each claim, B-Real introduced a bill of sale that transferred accounts listed in a computer file from Chase to B-Line, as well as redacted printouts of those computer files. The computer files contain essentially the same information that appears in the "Account Summary" attached to each proof of claim. Mr. Kane testified that these files represent the information B-Line received from Chase with respect to each account under the relevant bill of sale. Lastly, a document representing the assignment of these accounts from B-Line to B-Real was introduced for each account. The Court finds that these documents, taken together, are sufficient to establish, by a preponderance of the evidence, an evidentiary link from Chase, as the original account holder, to B-Real, the filing claimant.[47] The Court therefore finds that B-Real has met its initial burden to show that it is the

---

[46] For Cleveland Claim # 17-2, 13 additional monthly account statements; Ellis-Gough Claim # 5-2, 22 additional monthly statements; Ellis-Gough Claim # 6-2, 24 additional monthly account statements; Inks Claim # 13-2, 25 additional monthly account statements.

[47] B-Real and Roundup strenuously argue that no evidence of a claim's transfer is required to be provided with a proof of claim, citing Rule 3001(e). *See also In re Relford*, 323 B.R. 669, 681 (Bankr. S.D. Ind. 2004) (on reconsideration) (relying on the 1991 Amendment to the Advisory Committee Notes to Rule 3001, the court held that it initially erred in finding that a proof of claim must include evidence of a transfer), and *In re Peck*, 2008 WL 416927 (only transferor, and not debtor, has standing to object to claim assignment). While some courts have taken this approach, other courts have found that Rule 3001(c) requires evidence of a right to payment. *See In re Kendall*, 380 B.R. 37, 47 n.11 (Bankr. N.D. Okla. 2007); *In re Povey*, No. 07-80076, 2008 WL 1376271 (Bankr. E.D. Okla. April 9, 2008); *In re Kincaid*, 388 B.R. at 617; *In re Rochester*, 2005 WL 3670877 at *3. The sufficiency of evidence provided in support of a

owner of the accounts at issue and therefore has a right to payment on these claims in the amounts listed in the proofs of claim, subject to rebuttal by Debtors.

*Cleveland Claim # 18-3*

In Cleveland Claim # 18-3, Roundup asserts a secured claim of $5,583.97 for money loaned, describing a judgment as the collateral for the loan.[48]   A copy of the Judgment in favor of Crown against William Cleveland is attached.   The Judgment breaks down the amount of the award into principal, post-default interest, costs, attorney fees, and accruing interest.   Although Mr. Cleveland pled ignorance of the lawsuit filed by Crown, his testimony at trial was directly controverted by his own Statement of Financial Affairs, which listed the lawsuit.   Regardless of whether Mr. Cleveland believes he was not the correct party in that lawsuit, or that he does not owe a debt to Crown, the *Rooker-Feldman* doctrine prevents him from seeking review of a state court judgment in this Court.[49]   This Court's finding that Crown holds an enforceable judgment against Mr. Cleveland is sufficient to meet the requirements of proving the validity and amount of the claim.

While at first glance this claim appears to fall into the second or third categories of the *Rochester* framework, on closer inspection it has a unique twist.   Although Crown is not listed in the Cleveland's Schedule F, the Court found as a matter of fact that Crown holds a valid claim

---

proof of claim is determined on a case-by-case basis. *In re Samson*, 392 B.R. 724, at *8 (citing *In re Burkett*, 329 B.R. 820, 829 (Bankr. S.D. Ohio 2005)). Having undertaken a review of the enforceablilty and allowance of B-Real's claims pursuant to § 502(b), the Court finds the evidence submitted in these cases to be sufficient to show that B-Real is the owner of these claims. *See id.* at *7.

[48]   As discussed *supra*, absent any evidence to the contrary, the Court will treat Cleveland Claim # 18-3 as an unsecured non-priority claim.

[49]   See *Kenmen Eng'g v. City of Union*, 314 F.3d 468, 473 (10th Cir. 2002) for a discussion of the *Rooker-Feldman* doctrine.

against Mr. Cleveland.  At the hearing, Roundup introduced a purchase agreement that established the sale of accounts from Crown to B-Line.  Roundup also introduced an assignment that transferred specific accounts listed in a computer file from Crown to Roundup.  A redacted printout of that computer file was provided.  Mr. Kane verified that the computer printout recounts the specific accounts transferred by the referenced assignment.  The Court finds that these documents are sufficient to establish, by a preponderance of the evidence, an evidentiary link from Crown, as judgment holder, to Roundup, the filing claimant.[50]  The Court therefore finds that Roundup has a right to payment on Cleveland Claim # 18-3, subject to rebuttal by the Clevelands.

*Inks Claim # 9-2*

Inks Claim # 9-2 includes copies of account statements for 6 months prior to the charge off of the debt by Sears.  These statements include Mr. Inks's name, account number, and a breakdown of charges, interest, and late fees during that period, and are in the form of business records sent directly from Sears to Mr. Inks or his appointed agent.  The evidence accompanying Inks Claim # 9-2 is sufficient to indicate that Sears held a valid debt against Mr. Inks and to establish the amount of the claim.

At the hearing, Roundup introduced a purchase agreement that describes the terms of sale of accounts from Sherman to Roundup.  Also introduced was a bill of sale transferring specific accounts listed in a computer file from Sherman to Roundup, as well as a redacted printout of that computer file.  Mr. Kane testified that Mr. Inks's account, which is listed in the computer file, was among those transferred under the bill of sale.  No document or testimony was presented that

---

[50] As stated *supra* at note 47, the Court does not decide whether evidence of such a transfer is required, only that the evidence as submitted indicates that such an transfer of ownership occurred.

directly evidenced an assignment of any account from Sears, the original creditor, to either Sherman or Roundup.  The information in the computer file regarding the Inks account included an entry that identified "Sears–SEARS PREMIER CARD" as the original creditor.[51]  Although Mr. Kane testified that Mr. Inks's Sears account was included among those purchased from Sherman, his knowledge of this stems from the reference to Sears in the relevant computer file.[52]  The purchase agreement between Sherman and Roundup sets forth the terms by which Roundup regularly purchases accounts from Sherman.[53]  That agreement refers to entities that generated the original cardholder accounts as "Original Sellers,"[54] and lists Sears as being among those original sellers.[55]  The Court finds that this claim falls into the second category in the *Rochester* framework, and that the documentation showing that Sherman is a regular purchaser of Sears's accounts is sufficient for the Court to find an evidentiary link between Sears, a scheduled creditor, and Sherman.

While Roundup has not presented irrefutable proof of its ownership of the Sears debt, the Court notes that irrefutable proof is not the relevant burden.  As one court recently noted:

---

[51]  *Inks Joint Exhibit 12.*

[52]  *Transcript*, Page 164, lines 2–7:

Ms. Tran (attorney for Claimants):  [I]s Mr. Inks' Sears account included in the assignment of accounts from Sherman to Roundup?

Mr. Kane:  Yes, it is.

Ms. Tran:  How do you know this?

Mr. Kane:  It was in the computer file.

[53]  *Inks Joint Exhibit 11.*

[54]  *Id.* at 2.

[55]  *Id.* at 15.

22

For those courts finding that evidence of an assignment is necessary to substantiate a claim for purposes of Bankruptcy Rule 3001, it is generally agreed that such evidence does not have to be exacting--e.g., the documentation for the assignment does not have to specify a debtor's particular account number. Instead, evidence of a blanket assignment may suffice. For example, in *In re Hughes* the court found that documents which verify that the debtor's original creditors routinely sell their credit-card accounts to the assignee filing the proof of claim may suffice as prima facie evidence of the transfer for purposes of Bankruptcy Rule 3001. 313 B.R. at 211. This Court concurs.

In strong contradiction to the position advocated by the Debtors, nothing in Bankruptcy Rule 3001 indicates that documentation showing the specific transfer of the debtor's individual account is required to establish the validity of an assignment. As observed in the case of *In re Kincaid*: Bankruptcy Rule 3001 "only requires the writing by which the *claimant acquired* its claim." 388 B.R. 610, 615 (Bankr. E.D. Pa. 2008) (emphasis in original). This reading also conforms with the purpose of Bankruptcy Rule 3001 which is meant to expedite the claim's process by providing certain minimum evidentiary standards by which proofs of claim may be assessed. *In re Cluff*, 313 B.R. at 332. The Rule was never meant to require that a creditor provide incontrovertible proof of its claim.[56]

The Court in these matters is not analyzing the proofs of claim to establish their fitness to serve as prima facie evidence, but is instead deciding whether the evidence presented by Roundup meets its burden of production to prove it holds an enforceable claim.  But the same principles apply. Roundup has provided evidence that it purchased Inks's underlying account from Sherman, and that Sherman regularly purchases defaulted debt from Sears.  Taken together with the account statements, which establish the validity and amount of the claim, and the fact that the debt was scheduled by Mr. Inks under his Sears account number, this evidence is sufficient to meet Roundup's burden of production that it has a right to payment on a valid claim in the claimed amount.

Claimants have met their burden to establish the validity, amount, and their right to payment on each of the subject claims.  The burden now shifts to the Debtors to bring forward *evidence* in

---

[56] *In re Samson*, 392 B.R.724, at *5 (Bankr. N.D. Ohio 2008).

23

support of their objections,[57] namely that Claimants do not in fact own the debts underlying the proofs of claim, that the amounts claimed are incorrect, or that the claims are otherwise unenforceable under state law.

**Enforceability of Claims**

Debtors argue that the claims filed by Claimants are not enforceable under Oklahoma law, relying on the following statutes from the Oklahoma Uniform Consumer Credit Code ("OCCC"):

**OCCC § 3-501 – Definitions: Supervised Loan – Supervised Lender:**

(1) "Supervised loan" means a consumer loan in which the rate of the loan finance charge exceeds ten percent (10%) per year as determined according to the provisions on loan finance charge for consumer loans (Section 3-201).

(2) "Supervised lender" means a person authorized to make or take assignments of supervised loans.[58]

**OCCC § 3-502 – Authority to Make Supervised Loans:**

(1) Unless a person is a supervised financial organization or has first obtained a license from the Administrator authorizing the person to make supervised loans, a person shall not engage in the business of:
    (a) making supervised loans; or
    (b) *taking assignments and undertaking direct collection of payments from or enforcement of rights against debtors arising from supervised loans.*[59]

In order to raise this argument, Debtors must concede that Claimants are, in fact, the legal owners of the accounts at issue.  Debtors argue that Claimants are attempting to collect "supervised loans," as that term is defined in OCCC § 3-501, which is prohibited under OCCC § 3-502(1) absent proper authority.  In addition, Debtors cite to a 1975 opinion of the Attorney General of Oklahoma, which

---

[57] *See In re Broadband Wireless Int'l Corp.*, 295 B.R. 140, 145 (10th Cir. BAP 2003).

[58] Okla. Stat. tit. 14A, § 3-501 (West 1996).

[59] Okla. Stat. tit. 14A, § 3-502 (West 1996 & Supp. 2008) (emphasis added).

states that entities taking assignment of accounts subject to the OCCC are themselves subject to provisions of the OCCC.[60]

Both the Claimants and the Standing Chapter 13 Trustee for this district, Lonnie Eck, argue that the Claimants' actions with respect to these claims do not run afoul of OCCC § 3-502(1). This Court agrees. Assuming for purposes of this argument that the claims at issue arose from "supervised loans," the Claimants only action with respect to those claims has been to file proofs of claim against the relevant bankruptcy estates. They have taken no action that could be construed as either "direct collection of payments from" or "enforcement of rights against" any of the Debtors as individuals. In fact, as Claimants and the Trustee correctly point out, any such collection action against the Debtors directly would be a blatant violation of the automatic stay imposed by § 362(a). The Court rejects any suggestion that the filing of a proof of claim against a debtor's bankruptcy estate constitutes a personal collection effort against the debtor as an individual, such that it would be a violation of OCCC § 3-502. As one court noted,

> the filing of a Proof of Claim is expressly provided for by Fed. R. Bankr. P. 3002 and is necessary for a creditor to protect its interests in a Chapter 13 case. Fed. R. Bankr. P. 3002(a), in fact, provides that "[a]n unsecured creditor or an equity security holder must file a proof of claim or interest for the claim or interest to be allowed, except as provided in Rules 1019(3), 3003, 3004, and 3005."[61]

Claimants here have met their burden to show that they are owners of the subject accounts, and as such they have a right to payment on these claims, subject to rebuttal by the Debtors. Even assuming that OCCC §§ 3-501 and 3-502 would operate as Debtors urge in Oklahoma state courts,[62]

---

[60] Okla. Op. Att'y Gen. 75-227 (1975).

[61] *In re Sammon*, 253 B.R. 672, 680 (Bankr. D.S.C. 2000) (finding that filing a proof of claim is not a violation of the automatic stay).

[62] The Court draws no conclusion regarding the operation of these statutes in state court.

a state law that restricts Claimants from initiating legal process against the Debtors, as individuals, will not prevent Claimants from participating in the distribution of these estates under the Bankruptcy Code.

**Allowance of Claims**

Debtors presented no evidence to rebut the Claimants' evidence with respect to the validity, ownership, or amount of the disputed claims. Beyond testimony that they had never heard of Claimants, Debtors did not present any evidence to refute Claimants' ownership of these claims.[63] Debtors ostensibly disputed these debts in their schedules because they could not determine the correct amount owed to the original creditors.[64] Claimants have provided several months, and in some cases years, of account statements for each claim, which allow the Debtors to see every charge, every fee, every interest rate applied to their accounts pre-petition. To the extent Debtors claim not to know how much they owe, Claimants have provided the means to find out.[65] Having found that

---

[63] The Court gives no weight to the fact that the Debtors deny any knowledge of B-Real or Roundup. Since these firms only acquired Debtors' claims after the automatic stays went into effect, they were not at liberty to inform Debtors of their acquisition. The Court notes that Debtors presented the testimony of Mr. William Mark Bonney, who serves as Standing Chapter 13 Trustee for the Eastern District of Oklahoma. Mr. Bonney was not designated as an expert, although he gave his opinion regarding the factual and legal conclusions he felt the Court should draw from the proffered evidence.

[64] As discussed in *In re Chalakee*, 385 B.R. 771, 776 (Bankr. N.D. Okla. 2008), the Court can find no legal implication of designating a scheduled debt as "disputed" in a Chapter 13 case. At the hearing on these matters, only Mr. Inks was able to provide the Court with a coherent explanation of why he designated a number of his debts as disputed, since he had no record of what, if anything, the entity Credit Solutions had paid toward his debts immediately prior to filing. Although Ms. Ellis-Gough did not receive her statements for some period of time, she acknowledged that she received account statements for both accounts for approximately two years prior to filing, and had not raised any dispute with the card issuer during that time. Mr. Cleveland testified that he was always in custody of his account statements.

[65] *See In re Patton*, 388 B.R. 629, 635 (Bankr. E.D. Pa. 2008) ("Simply saying 'I don't know, I don't understand' is insufficient when the claimant has provided the detail to enable a

the presentation of account statements is sufficient to establish the validity of the claims and the amounts owed, the Court concludes that it is incumbent upon the Debtors to come forward with evidence to rebut those elements.[66]  To the extent Debtors believe that fees or interest were charged to these accounts in violation of their cardholder agreements, they were entitled to present those agreements to the Court.  Here none did.  Claimants have met their burden to establish by a preponderance of the evidence that a breach of contract occurred and that they hold enforceable claims that should be allowed against the Debtors herein.  Given the proof presented by Claimants, and the absence of any rebuttal evidence by Debtors, the Court finds that each of the claims are allowed as amended.

## Conclusion

The Court finds that Debtors' objections to Cleveland Claims # 17-2 & #18-3; Ellis-Gough Claims # 5-2 & # 6-2; and Inks Claims # 9-2 & # 13-2 are overruled.  Those claims are allowed  in the amounts claimed.  A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 30th day of September, 2008.

BY THE COURT:

TERRENCE L. MICHAEL
UNITED STATES BANKRUPTCY JUDGE

5251.6

---

meaningful inquiry as here and the debtor refuses to undertake it.").

[66]  *See In re Peck*, No. 07-12251, 2008 WL 416927 at *3 (Bankr. E.D. Pa. Feb. 13, 2008) ("Given that the Court has found the claim to be presumptively valid, it is the Debtor who has it backwards:  if the *Debtor* wishes to *disprove* the validity of the other charges, then it is the *Debtor* who must prove what fees may be charged, if any.").